Brett M. Buterick, Esquire  (*pro hac vice* forthcoming)
Thomas Emmons, Esquire  (*pro hac vice* forthcoming)
**THE FRANCHISE FIRM LLP**
225 Wilmington West Chester Pike, Suite 200
Chadds Ford, Pennsylvania 19317
Tel: 215.965.9499
brett@thefranchisefirm.com
tom@thefranchisefirm.com

Pooja S. Nair (SBN 281972)
**ERVIN COHEN & JESSUP LLP**
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
Telephone: (310) 273-6333
Facsimile: (310) 859-2325
pnair@ecjlaw.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO/OAKLAND DIVISION**

| | |
|---|---|
| DIVYANG VED,<br><br>Plaintiff,<br><br>v.<br><br>GLOBAL FITNESS VENTURES, LLC,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR**<br>**(1) BREACH OF FIDUCIARY DUTY;**<br>**(2) BREACH OF CONTRACT;**<br>**(3) INTENTIONAL MISREPRESENTATION;**<br>**(4) NEGLIGENT MISREPRESENTATION;**<br>**(5) ACCOUNTING;**<br><br>**DEMAND FOR JURY TRIAL** |

# COMPLAINT

Plaintiff, Divyang Ved ("Plaintiff" or "D. Ved"), by and through its attorneys, and for its Complaint, alleges:

## THE PARTIES

1. D. Ved, is a minority Limited Partner ("LP") in Spain Fitness Ventures, LP (the "Partnership").

2. Defendant, Global Fitness Ventures, LLC ("Defendant" or "General Partner") is a Delaware limited liability corporation doing business in San Francisco, CA, formed for the purpose of developing fitness clubs in Spain and Portugal.

## JURISDICTION AND VENUE

This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and is between citizens of different states.

Further, an actual, justiciable controversy now exists between the parties, and the requested relief is proper under 28 U.S.C. §§ 2201-2202.

Venue is appropriate in this district under 28 U.S.C. § 1391(b) because Section 15.3 of the Amended Limited Partnership Agreement (the "LPA") between the Parties designates the United States District Court of the Northern District of California as a justiciable venue for the resolution of litigation arising from the LPA.

Pursuant to Section 15.2(a) of the LPA, all questions concerning the construction, interpretation and validity of the LPA are governed by the laws of the State of Nevada.

## FACTUAL ALLEGATIONS

### The Agreements

1. On or about June 23, 2015, subsequently amended on January 1, 2017, D. Ved and other limited partners (the "Limited Partners"), and the General Partner entered into the LPA, the effect of which was to form the Nevada limited partnership known as Spain Fitness Ventures, LP (the "Partnership").

2. The purpose of the Partnership was the development, ownership, operation and sale of fitness clubs in Spain and Portugal.

3.      On or about November 2, 2015, the Partnership and Crunch Franchising, LLC (the "Master Franchisor") entered into an agreement (the "Master Franchise Agreement" or "MFA").

4.      On or about May 15, 2015, subsequently amended on June 14, 2018, the Partnership and Polaris Sports Limited (the "CR7 Licensor") entered into a licensing agreement (the "CR7 License Agreement").

5.      By and through the MFA and the CR7 License Agreement, the Partnership was granted the exclusive rights in Spain and consent rights in Portugal to establish fitness clubs and ancillary services using Master Franchisor's and CR7 Licensor's registered trademarks (collectively, the "Marks").

6.      The initial terms of both the MFA and the CR7 License Agreement, so long as not otherwise terminated, are ten (10) years, with two (2) renewal options of ten (10) years.

### Representations to D. Ved Prior to Investment

7.      In 2016, prior to D. Ved's investment, D. Ved met with Doug Raetz ("D. Raetz"), a principal of the General Partner, at the Faena Hotel in Miami to discuss the investment.

8.      At the meeting, D. Raetz told D. Ved that when he showed Cristiano Ronaldo pictures of the Crunch Fitness locations in the United States, pictures of the equipment, and the membership numbers, Cristiano Ronaldo said "I can bring a gym that looks like this to my people? I'm in."

9.      Similarly, the investment deck presented to D. Ved in 2016 describes Cristiano Ronaldo as a significant draw to the investment, and emphasized his level of involvement. Specifically, the deck purports that the General Partner "has partnered exclusively with Crunch Fitness and global icon Cristiano Ronaldo to develop signature CR7 branded Crunch Fitness health clubs across Spain," while also highlighting Cristiano Ronaldo's massive social media presence (calling him a "social media megastar with over 103 million Facebook fans, 36 million Twitter followers, two million YouTube videos and over 100 million entries on Google. In 2014, he broke yet another record as the first celebrity ever to obtain 100 million Facebook likes").

10.     Based on the representations made by the General Partner, D. Ved made capital contributions to the Partnership totaling $640,000.00 in 2016 and 2017.

**General Mismanagement**

11. Since the Partnership's conception, the General Partner has consistently failed to fulfil its fiduciary duties and contractual obligations.

12. The General Partner has displayed a lack of transparency and adequate reporting by way of minimal updates on critical business developments, including the Partnership's financial struggles and delays in project timelines.

13. For example, the Partnership's Q2 2023 quarterly update documented a 23% markdown in equity, reflecting serious concerns about the Partnership's valuation and financial health.

14. Email correspondence reveals that the General Partner has failed to communicate openly and transparently with investors, depriving them of the ability to make informed decisions about their investments.

15. In addition to licensing the use of Cristiano Ronaldo, the CR7 License Agreement also purported to furnish the services of Cristiano Ronaldo in connection with the Partnership.

16. These services were to consist of quarterly posts on Cristiano Ronaldo's Instagram page (as the most followed person on Instagram), as well as attending promotional events in Spain on an annual basis to drive gym openings.

17. Principals of the General Partner also represented to D. Ved that there was potential down the line for Cristiano Ronaldo (as an equity owner) to eventually significantly ramp up his engagement with the brand.

18. D. Ved was told from the very beginning that Cristiano Ronaldo's attendance at gym openings would eventually extend to Portugal (where he is extremely popular) and, further down the line, could potentially extend to the Middle East and China (where he also has a significant following), if they were to expand into those areas.

19. Doug Raetz ("D. Raetz"), a principal of the General Partner, represented to D. Ved prior to executing the LPA (and repeatedly since) that the General Partner had the ear of Ricardo Regufe ("R. Regufe"), a close friend and personal manager to Cristiano Ronaldo. D. Raetz repeatedly told D. Ved and other investors that R. Regufe loved the business and would support it.

20. Prior and subsequent to executing the LPA, principals of the General Partner have repeatedly represented to D. Ved that Cristiano Ronaldo's engagement would be substantially more than it actually was.

21. In fact, quarterly updates to investors, including a December 2019 update described the Partnership as "a joint venture between Crunch Fitness, Cristiano Ronaldo, and True Capital."

22. On March 31, 2023, Chris Dedicik wrote in an email to D. Ved: "With regards to support from Cristiano, we have his complete buy in, but we do need some positive business momentum in order to engage him more directly. The videos/posts he has done attract tons of attention and increase brand awareness, however they haven't yet translated in to local member growth. Once the business has advanced a little more, we will work closely with Cristiano and his team to produce support that should help move the needle re: member acquisition in the markets where we operate. For the time being, we have his preferred mktg agency on retainer (they are based in Lisbon) and we work with them on a weekly basis to try to find more ways to drive revenue/membership sales with as much use of Cristiano's image and brand power as possible."

23. On a May 2023 call, D. Raetz mentioned that the General Partner had Cristiano Ronaldo's marketing agency on retainer, and stated that the General Partner was working with the marketing agency on the best ways to promote the brand. A 2024 Investor Deck specifically mentions "marketing by Crisitano Ronaldo" as a strategic advantage of the business.

24. This pattern of misrepresentation is plain from the investor marketing materials published by the General Partner, through which the General Partner has continued to exaggerate Cristiano Ronaldo's level of engagement.

25. Specifically, several of the General Partner's FAQs and other marketing materials misrepresent to investors that Cristiano Ronaldo would be active both in person and on social media, drawing attention to the fact that he has a larger Instagram following than any person in the world.

26. A September 5, 2023 FAQ document prepared by MFS Capital Advisors states: "Cristiano Ronaldo is a member of the CR7 management team," and "Management thinks that there is room to further incorporate Ronaldo into the overall gym experience (e.g., win a signed

soccer ball by Ronaldo, get tickets to a game, get jerseys, spend two nights in the CR7 hotel…etc.), which could have a positive impact on creating stickier relationships with members."

27. The September 5, 2023 document further states that the Partnership was required to pay a $3 million minimum to Cristiano Ronaldo and his team, that the Partnership had been doing so for seven years, and that "[b]efore any capital deployment, the current licensing agreement will be restructured, which has already been discussed with Cristiano's team (**Management's relationship is very strong with Cristiano and his team, and it is just a matter of restructuring the agreement.**") (emphasis added).

28. A September 11, 2023 FAQ document prepared by MFS Capital Advisors lists Cristiano Ronaldo as a member of the Advisory Team and states that his role is: "Project-based, not involved in day-to-day but plans to support marketing efforts post-funding." Additionally, that same FAQ includes the question: "Could you provide any examples of Ronaldo's recent involvement or support of the concept from a marketing/awareness perspective?" The answer states: "Post-transaction, the plan is to have Ronaldo and his team much more engaged. Post-transaction, Management is preparing a PR launch in Spain, Portugal & Mexico, which will be further supported by additional social media posts from Ronaldo."

29. These FAQs provided to investors emphasize Ronaldo's importance to the Partnership.

30. D. Raetz represented to D. Ved and other investors that the General Partner's connection with R. Regufe was going to be instrumental to getting Cristiano Ronaldo to substantially promote the Partnership. Specifically, on a March 2024 call, D. Raetz told D. Ved that the General Partner was working with Ronaldo's team to promote the brand and look for additional avenues to promote the brand in Europe with Ronaldo.

31. On a June 17, 2024 call, D. Raetz stated repeatedly that the General Partner spoke to R. Regufe and Cristiano Ronaldo's team regularly. D Raetz stated that he had recently spoken to Ronaldo's team and R. Regufe and touted the General Partner's excellent relationship with both of them. On the call, D. Raetz stated: "I have no doubt that we'll renew this [the licensing agreement] and keep plugging away"

32. As it turned out, however, upon information and belief, the General Partner had greatly exaggerated and overstated his influence with R. Regufe (and, by extension, Cristiano Ronaldo).

33. Aside from one Instagram post in 2020, another post in 2021, and attendance at one gym opening in 2017, Cristiano Ronaldo's engagement on behalf of the brand was non-existent.

34. Additionally, General Partner failed to pay the required minimum licensing fee to Cristiano Ronaldo and his team. General Partner has therefore failed to meet the development timeline in the agreement for additional locations and branding.

35. Further, the introduction between CR7 Licensor and the Partnership was made by Javier Perez ("J. Perez").

36. On or about April 23, 2018, the General Partner and the Partnership brought a civil suit against J. Perez and others in California State Court as a result of the alleged fraud and misappropriation of funds.

37. The operative First Amended Complaint in the J. Perez lawsuit alleges that Perez created CR7 Management as a vehicle to "perpetuate his already contemplated fraud" and that J. Perez swapped the signature pages on certain agreements in order to steal hundreds of thousands of dollars from the Partnership.

38. Upon information and belief, J. Perez committed fraud and misappropriated significant funds in connection with the aforementioned deal.

39. Upon information and belief, this litigation was settled on or about January 16, 2019.

40. This ongoing litigation reflects a larger pattern of the General Partner's habitual failure to perform due diligence before making major business decisions on behalf of the Partnership.

**Rock Gym Litigation**

41. In 2019, the Partnership acquired the Rock Gym fitness chain ("Rock Gym") for approximately €5.5 million in cash and $5.5 million in limited partnership interests.

42. Upon information and belief, the introduction to Rock Gym was made by Mark

Mastrov, a principal of the General Partner.

43. At this time, the nature of Mark Mastrov's relationship with Rock Gym is unknown.

44. The acquisition was intended to increase the Partnership's footprint to twelve gyms with plans to rebrand these gyms under the CR7 Fitness by Crunch brand to boost revenue.

45. Quarterly updates provided to investors routinely touted the numbers of locations absorbed in the Rock Gym transaction and how we had all these gyms open and operating. However, in reality, the litigation and settlement were never worked out, so the Partnership did not actually have these gyms operating on its behalf.

46. However, quarterly updates reveal these rebranding efforts were significantly delayed, resulted in significant and costly litigation, and remain incomplete to date.

47. Upon information and belief, the General Partner *failed to do due diligence* on the Rock Gym acquisition, which resulted in the aforementioned litigation.

48. In the aftermath of the Rock Gym acquisition and litigation, D. Raetz repeatedly told D. Ved that the previous owner of Rock Gym was a fraud, and that he repeatedly lied about lease terms on locations and other items. This included an email from D. Raetz to D. Ved on May 30, 2024.

49. Presumably, if the General Partner had conducted due diligence, it would have caught these egregious oversights about Rock Gym's fraud and misrepresentations, thereby saving the Partnership years of legal fees and saving it from being buried in this botched acquisition cost.

50. Although the General Partner told D. Ved for years that the Rock Gym acquisition was going to be settled imminently, the litigation remains ongoing to date.

51. Upon information and belief, more than half of the Rock Gym facilities that were to be acquired in the transaction have either permanently closed or were never transferred to the General Partner to begin with due to the fraud committed by its previous owner.

/ / /

/ / /

/ / /

**CR7 Licensing Agreement Breach**

52. Further, upon information and belief, the General Partner has breached the CR7 License Agreement.

53. Upon information and belief, the General Partner is behind more than $1,200,000 (3 years' worth) on royalty payments to the CR7 Licensor.

54. Upon information and belief, the General Partner has also not fulfilled its obligation under the CR7 License Agreement to sell a minimum of sixty (60) CR7 clubs/gyms.

55. The General Partner's failure to fulfill these obligations should come as no surprise considering the almost non-existent effort made to sell the franchise.

56. Upon information and belief, the General Partner never employed a sales team and other personnel fundamentally necessary to generate franchise sales and gym openings.

57. Upon information and belief, the General Partner has repeatedly represented to D. Ved as well as potential investors that the plan was to sell 50+ franchises in the near future and that here was a sales staff when, in fact, there was none.

58. The General Partner failed to hire a franchise sales team (or invest any resources related to franchise sales) while actively telling investors that it plans to sell 50+ franchises in the near term.

59. Due to the breach, upon information and belief the CR7 License Agreement is in severe jeopardy of not being renewed at the end of its term in 2025.

60. On a March 2025 call, D. Raetz stated that, despite numerous mentions over the years and as recently as July 2024 that the CR7 deal was going to be renewed, the license now would not be renewed.

61. Upon information and belief, the CR7 Licensor intends to decline its option to renew the CR7 License Agreement as a result of these breaches.

62. Given the weight of intangibles such as branding and licensing fees in the Partnership's valuation, non-renewal of the CR7 License Agreement would be catastrophic for the Partnership's financial prospects.

63. In FAQs dated September 11, 2023, General Partner wrote: "It is also worthwhile

noting that based on Management`s experience, gym concepts with a franchise arm (i.e., a recurring revenue stream with higher margins) are valued higher in M&A transactions, implying that further building out the CR7 Fitness franchise arm could boost its valuation upon a future exit."

64.     By reason of the General Partner's breaches of the CR7 License Agreement (as well as the LPA and MFA), D. Ved has sustained and will continue to sustain substantial injury, loss, and damage.

65.     Worse yet, upon information and belief, the General Partner recently sent a letter to Crunch Fitness in the U.S. indicating its desire to de-brand the Partnership from Crunch.

66.     Disassociating with Crunch Fitness would further tank the Partnership's valuation, especially in light of its failure to meet the contractual obligations of the CR7 License Agreement.

67.     Worse yet, the General Partner has failed to disclose to investors its intent to disassociate with Crunch Fitness – just as it has failed to disclose its failure to pay CR7 Licensor royalty payments for over three years.

## FIRST CLAIM

## (Breach of Fiduciary Duty)

68.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

69.     The General Partner has consistently failed to uphold its fiduciary duties of loyalty, care, and good faith under the laws of Nevada to the Limited Partners, evidenced by the chronic underperformance and financial mismanagement that has plagued the Partnership.

70.     An example of such underperformance is the Partnership's Q2 2023 quarterly update, which reflected a 23% markdown in equity.

71.     As an initial matter, the General Partner has displayed a consistent lack of transparency and adequate reporting since the conception of the Partnership, evidenced by the misleading public statements made to potential investors as well as its email correspondences with existing investors.

72.     Worse yet, upon information and belief, the General Partner breached the CR7 License Agreement on several levels.

73. Upon information and belief, the General Partner is behind more than $1,200,000 on royalty payments to the CR7 Licensor.

74. Upon information and belief, the General Partner has also not fulfilled its obligation under the CR7 License Agreement to sell a minimum of sixty (60) CR7 clubs/gyms.

75. The Partnership's financial records also reveal a troubling reliance on intangible assets, such as branding and licensing fees, which make up a significant portion of the Partnership's total assets.

76. The overvaluation of these intangibles, among other things, suggests that the General Partner has not acted in the best interests of the Limited Partners and has exposed them to unnecessary risk in the process.

77. Given the Partnership's overwhelming reliance on such intangibles (namely, Cristiano Ronaldo's brand) to support its valuation, the General Partner is exhibiting an egregious lack of judgment by not already negotiating a renewal of the CR7 License Agreement (due to expire within one year's time).

78. Further, the General Partner failed to conduct due diligence prior to its 2019 acquisition of Rock Gym, causing the Partnership to be thrust into litigation that has crippled the Partnership financially and severely jeopardized the Partnership's ability to renew the CR7 License Agreement.

79. For years, the General Partner falsely represented to D. Ved that the Rock Gym litigation was on the verge of being settled. To this day, the Rock Gym litigation persists.

80. As a direct and proximate result of the General Partner's failure to fulfill its fiduciary duty, Plaintiff has incurred and will continue to incur substantial losses, fees, and expenses to which Plaintiff is entitled.

## SECOND CLAIM
### (Breach of Contract)

81. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

82. The General Partner's actions and omissions also constitute a clear breach of the LPA and related agreements under the laws of Nevada.

83. The LPA required the General Partner to execute the business plan as presented to investors.

84. However, the General Partner has failed to do so, resulting in significant delays in the rebranding of the acquired gyms to the CR7 Fitness brand, potential termination of other branding partnerships, as well as an inability to capitalize on the anticipated growth of the CR7 by Crunch brand.

85. These failures are well-documented in the quarterly updates, which repeatedly highlight the Partnership's struggle to meet its operational goals and financial projections.

86. Further, the legal documents associated with the CR7 License Agreement and the MFA indicate potential non-compliance by the General Partner.

87. These agreements are critical to the Partnership's operations, and any failure to meet their terms could jeopardize the Partnership's ability to continue operating under these high-value brands.

88. The General Partner's failure to comply with these licensing obligations constitutes a breach of contract, as it directly undermines the Partnership's core business strategy and threatens the viability of the investment.

89. Moreover, the mismanagement of the 2019 acquisition of Rock Gym exemplifies the General Partner's continued inability to execute sound business decisions and protect investor interests.

90. The Partnership acquired Rock Gym, consisting of ten fitness clubs in Spain, for approximately €5.5 million in cash and $5.5 million in limited partnership interests.

91. The acquisition was intended to increase the Partnership's footprint to twelve gyms with plans to rebrand these gyms under the CR7 Fitness by Crunch brand to boost revenue.

92. However, quarterly updates reveal these rebranding efforts were significantly delayed, resulting in significant and costly litigation, and remain incomplete to date.

93. Furthermore, the General Partner's failure to adequately integrate and manage these newly acquired assets has placed undue financial strain on the Partnership, contributing to the subsequent markdown of the Partnership's equity and forcing the company into ongoing capital-

raising efforts to stabilize its balance sheet.

94. This mismanagement directly contradicts the promises made to investors and highlights the General Partner's ongoing pattern of breaching its contractual obligations (and fiduciary duties).

95. As a direct and proximate result of the General Partner's breach of the LPA and its related agreements, Plaintiff has incurred and will continue to incur substantial losses, fees, and expenses to which Plaintiff is entitled.

## THIRD CLAIM

### (Intentional Misrepresentation)

96. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

97. The General Partner materially misrepresented key aspects of the investment to Plaintiff, particularly regarding Cristiano Ronaldo's involvement in the CR7 Fitness by Crunch brand.

98. The investment materials provided to Plaintiff and other investors led them to believe Cristiano Ronaldo would be actively engaged in the marketing and operation of the CR7-branded gyms, leveraging his global influence to drive the success of the business.

99. However, as evidenced by quarterly updates and other communications, Cristiano Ronaldo's involvement has been minimal, limited to initial promotional efforts.

100. This lack of engagement has significantly diminished the anticipated value of the CR7 Fitness brand to the Partnership, resulting in financial losses to Plaintiff.

## FOURTH CLAIM

### (Negligent Misrepresentation)

101. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

102. The General Partner supplied information to Plaintiff regarding key aspects of the investment, particularly regarding Cristiano Ronaldo's involvement in the CR7 Fitness by Crunch brand.

103. The information supplied by the General Partner for the guidance of Plaintiff in his business transaction was false.

1          104.    The General Partner failed to exercise reasonable care or competence in obtaining and communicating the information to the Plaintiff.

2          105.    Plaintiff justifiably relied upon the information provided by the General Partner.

3          106.    Plaintiff sustained damage as a result of his reliance upon the accuracy of the information provided by the General Partner.

## FIFTH CLAIM

### (Accounting)

107.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

108.    A fiduciary relationship exists between Plaintiff and the General Partner.

109.    The LPA and Side Letter provide that the General Partner has a duty to render an accounting to Plaintiff to determine damages resulting from any misallocation of funds.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**PRAYER FOR RELIEF**

Plaintiff, by way of its Complaint, prays judgment against Defendants as follows:

(a) For an order appointing a receiver to manage the business of the Partnership, make all required distributions, and prevent financial mismanagement;

(b) For an order requiring Defendants to turn over to Plaintiff or an appointed receiver all books, assets, accounts, and records of the Partnership;

(c) For an accounting of the affairs of the Partnership;

(d) For compensatory, general and special damages in an amount according to proof;

(e) For attorney's fees and costs of suit incurred herein, as permitted by the LPA, and to the full extent permitted by law;

(f) For pre- and post-judgment interest; and

(g) For such other and further relief as the court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all claims so triable.

DATED: April 11, 2025

**THE FRANCHISE FIRM LLP**
Brett M. Buterick, Esquire *
Thomas Emmons, Esquire *
225 Wilmington West Chester Pike, Suite 200
Chadds Ford, Pennsylvania 19317
Tel: 215.965.9499
brett@thefranchisefirm.com
tom@thefranchisefirm.com

**ERVIN COHEN & JESSUP LLP**
Pooja S. Nair (SBN 281972)
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
Telephone: (310) 273-6333
pnair@ecjlaw.com

By: */S/ Pooja S. Nair*
POOJA S. NAIR

*Pro Hac Vice application forthcoming*